IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARK WELLS, | § | |
| TDCJ-CID NO.1390085, | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION H-08-2288 |
| | § | |
| NATHANIEL QUARTERMAN, *et al.*, | § | |
| Defendants. | § | |

OPINION ON DISMISSAL

Plaintiff Mark Wells, an inmate incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ-CID") proceeding *pro se* and *in forma pauperis*, has filed a complaint and a more definite statement alleging violations of his civil rights under 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"). (Docket Entries No.1, No.9). Defendants Nathaniel Quarterman, Alfonso Castillo, Laura Barnett, Frank Hoke, Lanette Linthicum, Thomas Goodson, William Scott Childress, Anthony Williams and Kimberly Cotton[1] have filed a motion for summary judgment (Docket Entries No.37, No.42), to which plaintiff has filed a response. (Docket Entry No.44). For the reasons to follow, the Court will grant defendants' motion for summary judgment and dismiss the complaint with prejudice.

I. BACKGROUND

Plaintiff, who is blind, was convicted in 2006, upon a negotiated plea, of a 1998 aggravated assault of a child in a Travis County, Texas state district court in cause number D-1-DC-06-904070; he was sentenced to ten years confinement on August 28, 2006. (Docket Entries

---

[1] All defendants are employed by the Texas Department of Criminal Justice-Correctional Institutions Division ("TDCJ-CID"), except for defendants Childress, Williams, Linthicum, and Cotton, who are employed by the University of Texas Medical Branch, Correctional Managed Care ("UTMB-CMC").

No.9, page 1; No.37-1, page 2); <u>TDCJ-CID website</u>.[2]  Plaintiff did not appeal the conviction and did not seek post-conviction relief in state or federal court.  (Docket Entry No.9, page 1).  On October 19, 2006, plaintiff was transferred to the Estelle Unit, where he is currently confined. (*Id*.).

Plaintiff claims the following events gave rise to the pending complaint:  Soon after he arrived at the Estelle Unit, plaintiff discovered that there was no way for him "as a blind inmate to communicate with the outside world or within T.D.C.J. system."  (Docket Entry No.1, page 9).  He could not independently read his private mail or conduct legal research.  (*Id*.).  He was unable to access the Visi-Tech device, which was the only adaptive equipment in the Estelle law library "'for the use of some visually impaired inmates."  (*Id*.).  Plaintiff enrolled in the Adaptive Resource Clinic, a rehabilitation program, which was located in the Regional Medical Facility on the Estelle Unit.  (*Id*.).  While the Adaptive Resource Clinic was equipped with a computer, the sound card had been disabled; consequently, the computer was of no use to plaintiff.  (*Id*., page 10).  Plaintiff contacted each defendant and requested assistance in "implementing technology" to assist him with his legal research and outside communication to no avail.  (*Id.*).

In the pending action, plaintiff complains that he has been denied access to the courts in violation of the First Amendment and the Americans with Disabilities Act ("ADA") because the Estelle Unit Law Library and the Adaptive Resource Clinic do not provide mechanical readers or sound-enhanced computer software to enable him to conduct legal research and draft his own documents.  (Docket Entry No.44, page 1).  Plaintiff also complains that he has been denied written contact with family, friends, and job prospects in violation of the First Amendment and the ADA because the Adaptive Resource Clinic lacks adaptive information

---

[2] http://168.51.178.33/webapp/TDCJ/InmateDetails.jsp?sidnumber=07646085

technology systems; thereby, depriving him from written contact with family, friends, or job prospects.  (*Id.*, page 2).

Plaintiff seeks compensatory and punitive damages from all defendants in their individual and official capacities.  (Docket Entry No.1, pages 1-2, 18).  He also seeks declaratory and injunctive relief.  (*Id.*, pages 9, 14, 18).

Defendants move for summary judgment on grounds that plaintiff has not shown that he was denied access to the courts, that he is entitled to monetary or equitable relief under 42 U.S.C. § 1983, or that he is entitled to relief under the ADA.  (Docket Entry No.37).

## II. DISCUSSION

To be entitled to summary judgment, the pleadings and summary judgment evidence must show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial.  *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992).  Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

## A. Monetary Damages for Individual Capacity Claims

Defendants move for summary judgment, in part, on grounds that plaintiff is not entitled to compensatory or punitive damages against them in their individual capacities. (Docket Entry No.37).

3

1. Civil Rights Action

The Civil Rights Act of 1866 creates a private right of action for redressing the violation of federal law by those acting under color of state law.  42 U.S.C. § 1983; *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82 (1984).  Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights conferred elsewhere.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Title 42 U.S.C. § 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury."  "Section 1997e(e) applies to all federal civil actions in which a prisoner alleges a constitutional violation, making compensatory damages for mental or emotional injuries non-recoverable, absent physical injury."  *Geiger v. Jowers*, 404 F.3d 371, 375 (5th Cir. 2005).  Because plaintiff alleges no physical injury resulting from defendants' alleged violation of his First Amendment rights, plaintiff cannot recover compensatory damages from defendants for claims arising under § 1983.

A prisoner may, absent a showing of physical injury, pursue punitive damages based upon a violation of his constitutional rights.  *Hutchins v. McDaniels*, 512 F.3d 193, 197-98 (5th Cir. 2007).  The summary judgment record shows no evidence that the conduct of any defendant was motivated by evil intent or a criminal indifference that would entitle plaintiff to recover punitive damages from any defendant in this case.  *See Williams v. Kaufman County*, 352 F.3d 994, 1015 (5th Cir. 2003) (noting standard requires "a subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations").  Therefore, plaintiff cannot recover punitive damages for claims arising under § 1983.

Accordingly, plaintiff's claims for compensatory and punitive damages against defendants in their individual capacities under § 1983 are subject to dismissal.  Defendants are entitled to summary judgment as a matter of law on this ground.

## 2. The ADA

The ADA is a federal anti-discrimination statute intended to eliminate discrimination against individuals with disabilities.  *Delano-Pyle v. Victoria County, Texas*, 302 F.3d 567, 574 (5th Cir. 2002).  Title II of the ADA authorizes suits by private citizens for money damages against public entities that violate 42 U.S.C. § 12132.  See 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794a).  Title II of the ADA applies to state prison facilities and state prison services.  *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998).

Although Title II provides disabled persons redress for discrimination by a public entity, it does not, by statutory definition, include individuals.  42 U.S.C. § 12131(1); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999); *Cole v. Velasquez*, 67 Fed. Appx. 252 n.11 (5th Cir. 2003) (not designated for publication).  Punitive damages are unavailable under the ADA.  *Barnes v. Gorman*, 536 U.S. 181, 189-90 (2002).  Therefore, plaintiff cannot recover punitive damages or compensatory relief from defendants in their individual capacities under the ADA.  Accordingly, defendants are entitled to summary judgment as a matter of law on this ground.

## B. Monetary Damages for Official Capacity Claims

Defendants contend that plaintiff cannot recover monetary damages on his claims against them in their official capacities on his First Amendment or ADA claims.  (Docket Entry No.37).

## 1. Civil Rights Action

Suits for monetary damages against the state are barred by the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 169 (1985). Under the Eleventh Amendment, an unconsenting state is immune from suits brought in federal courts by its own citizens as well as by citizens of another state. *Edelman v. Jordan,* 415 U.S. 651, 663 (1974). For Congress to validly abrogate a State's Eleventh Amendment immunity, Congress must unequivocally express its intent to abrogate that immunity and must act pursuant to a valid grant of constitutional authority. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000). Absent waiver, neither a state nor agencies acting under its control are subject to suit in federal court. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144 (1993). "[A] suit against a public official in his official capacity is in effect a suit against the local government entity he represents." *Mairena v. Foti*, 816 F.2d 1061, 1064 (5th Cir. 1987) (citations omitted). Therefore, in the absence of an express waiver, the Eleventh Amendment similarly bars the recovery of monetary damages for a claim against a state official in his or her official capacity. *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002).

Congress has not expressly waived sovereign immunity for suits filed under § 1983. *Quern v. Jordan*, 440 U.S. 332, 340-45 (1979). Therefore, plaintiff's § 1983 claims against defendants for monetary damages in their official capacities are barred by the Eleventh Amendment.

## 2. The ADA

The ADA provides that "[a] State shall not be immune under the eleventh amendment . . . from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. The Supreme Court has accepted this provision as an

6

unequivocal expression of Congress's intent to abrogate state sovereign immunity.  *United States v. Georgia*, 546 U.S. 151, 154 (2006).  However, when faced with the specific issue of whether a disabled inmate in a state prison may sue the State for money damages under Title II of the ADA, the Supreme Court has held that, "insofar as Title II creates a private cause of action for damages against States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."  *Id.* at 159 (emphasis in original) (noting in *Tennessee v. Lane*, 541 U.S. 509, 533-34 (2004), that members of the Court disagreed regarding the scope of Congress's prophylactic enforcement powers under § 5 of the Fourteenth Amendment, but not with respect to congressional power to enforce provisions of Fourteenth Amendment by creating remedies against States for actual violations of those provisions).  Because Title II prohibits a wider range of activities than the Constitution, courts are to consider the following "on a claim by claim basis" in determining whether sovereign immunity is abrogated:

1.　　　Which aspects of the State's alleged conduct violated Title II;

2.　　　To what extent such conduct also violated the Fourteenth Amendment [or Constitution]; and

3.　　　Insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment [or Constitution], whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id.*  To the extent that sovereign immunity is abrogated, the ADA provides for compensatory damages only upon a showing of intentional discrimination on the basis of disability.  *See Delano-Pyle*, 302 F.3d at 575.

　　　　　Title II requires a plaintiff to demonstrate that (1) he is a qualified individual, (2) who was excluded from participation in or denied the benefits of services, programs, or activities

of a public entity, and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability.  *See Lightbourn v. County of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997).  The parties do not dispute that as a blind inmate in state prison, plaintiff is a qualified individual with a disability for purposes of the ADA.  42 U.S.C. § 12131.

Title II of the ADA requires a public entity to make "reasonable accommodations to the known physical . . . limitations of an otherwise qualified handicapped applicant . . . unless the recipient can demonstrate the accommodation would impose an undue hardship on the operation of its program."  *Olmstead v. Zimring*, 527 U.S. 581, 606 n. 16 (1999).   The regulations implementing Title II of the ADA provide that "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity."  28 C.F.R. § 35.160(b)(1).  "In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities."  *Id.* § 35.160(b)(2).  "Auxiliary aids and services" are defined by the ADA to include "(B) qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments; (C) acquisition or modification of equipment or devices; and (D) other similar services and actions."  42 U.S.C. § 12103(1)(B), (C). (D).

### a. Access to the Courts

Inmates have a right of access to legal materials and prison officials cannot deny inmates access to the court.  *Bounds v. Smith*, 430 U.S. 817 (1976).  Law libraries and legal assistance programs, however, are not ends in themselves, but the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional

rights to the courts.  *Id.* at 823.  Plaintiff alleges that defendants violated Title II of the ADA by their failure to install specific adaptive or auxiliary equipment in the prison law library and the Adaptive Resource Clinic by which he might independently access legal materials to research issues for his post-conviction appeal and to prepare legal documents, and thereby, deprived him of access to the courts.  Defendants maintain that plaintiff was not excluded from participation in or denied the benefits of library services or Adaptive Resource Clinic programs, by which he was denied access to the courts.

Under Texas law, a timely notice of appeal from a criminal conviction must be filed within thirty days after the day sentence is imposed or within ninety days after the same if the defendant timely files a motion for new trial.  TEX. R. APP. P. 26.2.  By plaintiff's account, he was not incarcerated on the Estelle Unit until October 2006, almost a month after the expiration of the deadline to file a notice of appeal in state court.  (Docket Entry No.9, page 1).  Therefore, plaintiff cannot show defendants violated Title II by failing to provide adaptive technology in the Estelle Unit's law library or the Adaptive Resource Clinic, which deprived him of the opportunity to pursue a direct appeal from his criminal conviction.

Likewise, the summary judgment record does not reflect that defendants excluded plaintiff from the law library or the Adaptive Resource Clinic or denied his requests for specific and available equipment to assist him in filing a state or federal habeas petition.  The uncontravened record shows that plaintiff did not attempt to access the Estelle Unit's law library for legal research until June 2007, months after his transfer to the Unit in October, 2006, and three months before the expiration of the limitations period to file his federal habeas petition. Plaintiff claims that after he arrived on the Estelle Unit in 2006, he tried "to prepare for post

conviction relief" and with the assistance of inmate Paul Koumjian in the law library during October or November, 2006.  (Docket Entries No.1, No.44, pages 5, 8).

The record, however, does not support plaintiff's claim.  Koumjian does not state in his "Affidavit" that he assisted plaintiff with research in the law library or in the Adaptive Resource Clinic.  Koumjian states that he was classified in minimum custody transit status and confined twenty-three hours a day in his cell next to plaintiff's cell.  (*Id.*).  Koumjian further states that plaintiff requested his assistance to pursue post conviction relief in state and federal courts because plaintiff felt that he could not access any TDCJ programming due to his blindness.  (*Id.*, page 10).  Koumjian indicates that he was unable to see and confer with plaintiff after he was moved to a different cell two months later.  (*Id.*).

On June 20, 2007, three months before the expiration of the deadline to file a federal habeas petition, plaintiff began to attend regularly scheduled law library sessions with inmate Chris Cole, who is visually impaired.  (Docket Entry No.37-1, page 12).  Cole assisted plaintiff with his post-conviction legal research and with research on the Americans with Disabilities Act, which forms the basis of the present suit.  (Docket Entries No.37-6, page 24, No.44, page 8).  Cole read all legal research material and legal mail for plaintiff via closed circuit enlargement television ("CCTV").  (Docket Entry No.37-6, page 18).  Between June 29, 2007, and September 14, 2007, plaintiff and Cole had twenty-two legal visits, sixteen of which lasted two or more hours.  (Docket Entries No.37-1, pages 12-31, No.37-2, pages 1-4).  During this time, plaintiff requested "reasonable accommodations to be made so that I can have my legal visits with Chris Cole. . . .  Chris Cole and I will need to be able to sit together at the table which has the Closed Circuit Enlargen [sic] T.V. placed on it."  (Docket Entry No.37-6, page 21).  The record does not reflect that plaintiff requested any other accommodation during this time,

although he was aware that the ADA required such accommodation.[3]  (*Id.*, page 20).  Moreover, the record does not indicate that plaintiff was not afforded such accommodations.

Shortly before the federal limitations deadline expired, plaintiff requested other accommodations.   In a grievance dated September 27, 2007, the day that federal habeas limitations expired, plaintiff complained that on September 14, 2007, he had requested from Law Librarian Stambaugh some law books and other legal material on tape or in Braille because no other auxiliary adaptive equipment was available in the law library and because he "should not be at the 'whim' of other inmates or those who are not paralegals."  (Docket Entry No.37-6, page 24).  Plaintiff claims that Stambaugh said, "They [d]idn't [h]ave nothing [sic] like that."  (*Id.*).

In his response to the grievance on October 10, 2007, Warden Castillo stated that plaintiff was not being denied needed adaptive aids because his health summary sheet indicated that he was blind in only one eye and therefore, could access the CCTV in the law library.  (Docket Entry No.37-6, page 25).  The summary judgment record supports this misassumption.[4]  In his step 2 grievance, plaintiff refuted the misassumption about his visual acuity and his ability to utilize the CCTV.  (*Id.*, page 26).  Plaintiff, however, conceded that there was no transcription of law library books to Braille or tape; nevertheless, he insisted that he must be fully independent to work on his case.[5]  Almost a month after limitations expired, plaintiff requested a current

---

[3]  Plaintiff has attached to the response to the summary judgment motion a typewritten letter addressed to Frank Hoke, Director of Access to the Courts, and dated September 23, 2007, wherein plaintiff requests adaptive equipment other than the CCTV, books, tapes, and other inmates to assist him in working on his post-conviction appeal.  (Docket Entry No.44-1, page 12).  The date on the letter is handwritten and there is nothing to indicate that the letter was sent to or received by Hoke.

[4]  PHOP Clinic Notes dated December 1, 2006, indicate that the CCTV had magnification large enough for plaintiff to see.  (Docket Entry No.37-8, page 11).  Access to Courts Program Supervisor Frank Hoke attests that when plaintiff first entered TDCJ, administrators were told that he could see in one eye; therefore, they believed that plaintiff was utilizing the CCTV.  (Docket Entry No.42, page 8).

[5]  Plaintiff claims that he should be able to conduct legal research related to his criminal conviction independently, without relying on the assistance of other inmates; plaintiff claims that trusting another inmate with details of the

model computer with screen reading software and a connection to Westlaw. (*Id.*). In a response dated January 8, 2008, Kelly Ward indicated that by his own admission, plaintiff was receiving same-session legal visits with inmate Cole. (*Id.*, page 27).

Access to Court Program Supervisor Frank Hoke's uncontravened affidavit supports Stambaugh's response to plaintiff. Hoke attests that after consulting with the Reference Librarian at the State Law Library and the Blind & Physically Handicapped official at the Library of Congress, he is "simply unaware of any legal publication(s) (*e.g.* statutes, case law, digest, encyclopedia) that is made for the visually impaired." (Docket Entry No.42, page 9). Therefore, defendants could not provide plaintiff with the accommodation he requested two weeks before the limitations period expired.

Plaintiff, however, claims that he did not file Step 1 Grievance Number 2008016271, in which he requested legal books and materials on tape or in Braille, until September 27, 2007, because at that time he was allowed to take legal work into the Adaptive Resource Clinic, which led him to believe that the Adaptive Resource Clinic was going to get screen-reading software to assist him with legal work. (Docket Entry No.44, page 9). In support of such claim, plaintiff directs the Court to a clinic note dated December 21, 2006, in which defendant Thomas Goodson noted his intent to request a tape recorder and JAWS software to be

nature of his offense might result in a life-threatening injury. (Docket Entry No.44, page 6). In support of this claim, he directs the Court to three grievances that he filed in January 2007, before he began his library sessions with inmate Chris Cole in late June 2007, which he claims shows that he was threatened because of the nature of his offense. In Step 1 Grievance Number 2007070156, received on January 2, 2007, plaintiff complained that inmate Paul Coumagin sent money to his account and was threatening him if plaintiff did not repay him that money and more. (Docket Entry No.44, page 28). In Step 1 Grievance 2007075621, filed January 10, 2007, plaintiff complained of problems with inmate Kris Loveilett because he was spreading the word that plaintiff was a baby "raper." Docket Entries No.37-6, pages 8-9; No.44, page 30). Plaintiff withdrew the grievance the same day because the situation was "handled to his satisfaction." (Docket Entry No.37-6, page 10). In Step 1 Grievance 2007096563, dated January 27, 2007, plaintiff expressed fear of an assault or sexual assault by inmate Leighton Brenner, who had been moved to the same wing as plaintiff. Brenner referred to plaintiff as a baby "raper." (Docket Entries No.37-6, pages 11-12; No.44-1, page 2). Brenner was given a disciplinary conviction for threatening plaintiff. (Docket Entry No.37-6, page 14). None of these grievances reflect that information related to plaintiff's conviction was "leaked" by inmates who assisted him with legal research related to his appeal or habeas applications; instead, all three grievances were filed before plaintiff began to utilize the law library.

installed for class per plaintiff's request. (Docket Entry No.44-1, page 6). Goodson attests by affidavit that he forwarded such request to his supervisor but he was not authorized to obtain such equipment without approval. (Docket Entry No.42, page 12). Goodson further attests that the Adaptive Resource Clinic Program Manager determined that plaintiff did not demonstrate a need for the special software but a preference to use it. (*Id.*). Other notes written by Gooden in late November and December 2006, reflect plaintiff's claim to computer proficiency and his desire for a tape recorder and the installation of JAWS software on class computers; the notes do not show that plaintiff was researching legal issues or preparing legal documents in the Clinic. (Docket Entry No.44-1, pages 4, 6).

Almost a year after Goodson wrote the clinic note, plaintiff complained in Step 1 Grievance 2008065306, dated December 23, 2007, about the lack of adaptive equipment in the Adaptive Resource Clinic. (Docket Entry No.37-7, pages 2-3). He made no mention of needing the equipment to conduct legal research in the Adaptive Resource Clinic. (*Id.*). In March 2008, plaintiff filed another set of grievances number 2008105930, requesting adaptive software and equipment in the Adaptive Resource Clinic. (*Id.*, pages 4-7). He made no mention of legal work in this Step 1 Grievance but complained in the Step 2 Grievance that he could not do legal work in the Adaptive Resource Clinic without screen-reading software or any other adaptive equipment. (*Id.*, page 6). A clinic note dated March 19, 2008, reflects a discussion between plaintiff and defendant Kimberly Smith-Cotton, the Program Manager of the Assistive Disability Services ("ADS"), about plaintiff's request for special software for the Adaptive Aids Room so that his vision impaired assistant could help him with legal work. (*Id.*, page 15). Smith-Cotton advised plaintiff the Adaptive Resource Clinic was not designed to assist with legal work and that he should seek assistance in the law library. (*Id.*). The record shows that at that time,

13

plaintiff was already meeting with inmate Cole to research his legal issues in the law library. (Docket Entries No.37-2, pages 17-18, 20; No.37-3, pages 1, 3-6, 7-20, No.37-4, pages 4-8, 10-20; No.37-5, pages 1-4, 6-25).

In further support of his claim regarding his belief that such equipment would be made available to him in the Clinic, plaintiff refers the Court to a letter that he claims he wrote to defendant Frank Hoke on September 23, 2007, wherein he indicates that he is at the whim of other inmates to help him and that he needs equipment to effect his post conviction appeal. (Docket Entry No.44-1, page 12).  He has also attached a letter from his brother to defendant Smith-Cotton.  In such letter dated April 26, 2008, months after limitations expired, plaintiff's brother requested "a useful computer with software and hardware for the visually impaired." (*Id*., page 30).  Likewise, plaintiff directs the Court to an I-60 stamped June 1, 2008, in which he questions the content of a sign that stated that inmates were no longer allowed to bring legal work into the Adaptive Resource Clinic.  (Docket Entry No.44-2, page 6).  Such documents, however, do not support a claim that plaintiff was led to believe that adaptive equipment would be delivered to the Adaptive Resource Clinic for his use in researching legal issues and preparing legal documents.

Smith-Cotton attests by affidavit that the ADS offers limited vocational and educational services within the Adaptive Resource Clinic.  She attests that Adaptive Resource Clinic's purpose "is to teach very basic skills such as how to type on a keyboard and how to use the word processing function on a computer to disabled offenders."  (Docket Entry No.42, pages 2-3).  She notes that computers are available at the Clinic but they are not equipped with modern computer software and are not meant for anything other than vocational purposes.  (*Id*., page 3). She further notes that plaintiff does not need the vocational training offered by the Adaptive

Resource Clinic because he knows how to use computers and type on the keyboard, and he does not need a computer to write. (*Id.*). Plaintiff presents nothing to contravene Smith-Cotton's attestations.

The record shows that plaintiff has not filed, or attempted to file a state habeas application, although he is not precluded by law from doing so. (Docket Entry No.42, page 8). Texas law sets forth no statute of limitations with respect to filing a state habeas application from a criminal conviction. TEX. CODE CRIM. P. ANN., Art. 11.07 (Vernon 2005). The record also shows that plaintiff was not without access to legal materials in the Estelle Law Library by which he could file a state habeas application even after the federal limitations period expired. From November 2, 2007, through April 30, 2008, plaintiff and inmate Cole had fifty-six same-session law library visits. (Docket Entries No.37-2, pages 17-18, 20; No.37-3, pages 1, 3-6, 7-20, No.37-4, pages 4-8, 10-20; No.37-5, pages 1-4, 6-25). Plaintiff also met with inmate David Willis in the law library at plaintiff's request on May 14, 2008, and briefly on June 3, 2008, and July 15, 2008. (Docket Entries No.37-5, pages 29-30, No.37-6, pages 1-2). After plaintiff signed the pending complaint on July 16, 2008, and filed it on July 21, 2008 (Docket Entry No.1, page 19), he had one same-session library visit with inmate Cole on December 3, 2008. (Docket Entry No.37-6, page 3). Moreover, the Court notes that plaintiff has prosecuted the pending suit without the adaptive equipment he claims to need in order to perfect a state habeas application.

Although plaintiff was not afforded the specific accommodations that he claims that he needs to enable him to conduct legal research without inmate assistance, he fails to raise a material fact issue showing that defendants excluded him from the law library or the Adaptive Resource Clinic or intentionally denied him specific or available accommodations by which he

could utilize the law library for research.[6]   Moreover, the pleadings filed this case reflect that plaintiff had access to legal materials by which he filed the present complaint and by which he could have filed a habeas action in state or federal court.   Accordingly, plaintiff fails to show that he was excluded from the Estelle Unit's law library or denied access to its legal resources in violation of Title II of the ADA.

Likewise, the summary judgment evidence does not show that plaintiff suffered an actual injury attributable to defendants' conduct that would give rise to a First or Fourteenth

---

[6] In late October 2007, after federal limitations expired, plaintiff requested by grievance that he be furnished a current model computer with screen reading software and a connection to Westlaw so that he could research the legal issues independently.  (Id.).  The record affirmatively shows that TDCJ does not make computers available to any inmate at the law library.  (Docket Entry No.42, page 8).  In denying plaintiff's grievance, the grievance investigator noted in her January 8, 2008, response that plaintiff was receiving same-session legal visits with inmate Cole.  (Id., page 27).  She also informed plaintiff that Law Librarian Stambaugh had a current list of offenders that have volunteered to assist wanting offenders and that the State Counsel for Offenders might also provide him with legal assistance.  (Docket Entry No.37-6, page 27).  She noted that Stambaugh indicated that sighted offenders in the library provide visually impaired offenders assistance when solicited and recommended that he take advantage of this accommodation.  (Id.).  Plaintiff claims that Stambaugh's list shows offenders willing to assist Spanish speakers.  (Docket Entry No.44-2, page 2).  Plaintiff presents no summary judgment proof to show that this is the only volunteer list in the law library.

Plaintiff grieved the lack of paralegals in the law library in October and November 2007, and was again reminded that he was receiving same-session legal visits with Cole; he was also reminded of Stambaugh's list of offenders, the State Counsel for Offenders, and his eligibility to receive books through the Windham School.  (Docket Entries No.37-6, pages 28-30, No.37-7, page 1).

On March 6, 2008, Access to Courts Program Specialist I Michael S. Wheeler responded to a letter dated December 31, 2007, written by plaintiff's friend Burt W. Slater, regarding the lack of specialized equipment in the law library.  (Docket Entry No.44-1, page 28).  Wheeler indicated that that plaintiff was aware of the accommodations available to him to assist with legal research and that his rights were not being violated.  (Id.).

In early June 2008, plaintiff wrote Director Nathaniel Quarterman complaining that the Estelle Law Library had failed to accommodate his needs after numerous grievances and suggestions as to what it would take to accommodate his handicap.  (Docket Entry No.44-2, page 9).  Plaintiff indicated that the "necessary equipment to accommodate my handicap is currently located in the education department of the Estelle Unit, in the form of an accessible information technology system."   (Id., page 9-10).   An administrative assistant responded to the correspondence by a form, which indicated that his correspondence was being forwarded to the appropriate TDCJ department.  (Id., page 11).

Plaintiff attached typewritten copies of the same letter addressed to Warden Castillo, Frank Hoke, and Laura Barnett.  (Id., pages 13-14, 16-17, 19-20).  The dates on each letter are handwritten.  The letters lack markings or stamps that would indicate that Castillo, Hoke, or Barnett received them.  (Id.).

Amendment violation.[7]   Claims alleging violations of the right of access to courts are not cognizable unless the inmate's position as a litigant was prejudiced by the denial of access.  *See Chriceol v. Phillips*, 169 F.3d 313, 317 (5th Cir. 1999).  "[A]n inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey*, 518 U.S. 343, 351 (1996).  Because the right of access is not a "freestanding right," the plaintiff must demonstrate actual injury resulting from an alleged denial of access to the courts.  *Id.*  "Actual injury" is "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim."  *Id.* at 348.  Without a showing of an actual injury, a plaintiff lacks standing to pursue a claim of denial of access to the courts.  *Id.* at 349.

To meet the standing requirement, plaintiff "must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)) (emphasis in original).  Plaintiff "must establish that he has a personal stake in the alleged dispute and that the alleged injury suffered is particularized as to him." *Id.* at 819.  In particular, to succeed on a claim of denial of access to courts, plaintiff must show that he lost an actionable claim or was prevented from presenting such a claim because of the alleged denial. *See Lewis*, 518 U.S. at 356.  He must show "that his position as a litigant was prejudiced" as a direct result of the denial of access.  *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir.1996) (per curiam) (citation omitted).  As previously discussed, plaintiff has not shown that his failure to

---

[7] The right of access to the courts "is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974).  The right does not guarantee any "particular methodology but rather the conferral of a capability -- the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts."  *Lewis v. Casey*, 518 U.S. 343, 356 (1996).  The right of meaningful access, however, imposes a duty on prison officials to provide indigent inmates with either an adequate law library or adequate assistance from persons trained in the law. *Bounds v. Smith*, 430 U.S. 817, 828 (1976).

file a timely direct appeal or federal habeas petition was attributable to defendants' conduct or that he is precluded from filing a state habeas application.

Moreover, the right to access the courts only provides a reasonable opportunity to file nonfrivolous legal claims challenging convictions or conditions of confinement.  *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999).  Plaintiff's pleadings do not show that the issues upon which he sought review by state or federal courts are non-frivolous, given that he entered a negotiated guilty plea.[8]  In his More Definite Statement, plaintiff indicates that he would have brought "[a]llegations of misconduct, lack of evidence, ineffective assistance of counsel." (Docket Entry No.9, page 7).  He does not, however, make any factual allegations giving rise to misconduct, the lack of evidence, or the ineffectiveness of his trial counsel.  In his response to the summary judgment motion, plaintiff claims he would have pled "ineffective assistance of counsel, being blind, scared, and barely seeing counsel at the jail is adequate to show no independent investigation was done under *Strickland* nor adequate time to prepare a defense." (Docket Entry No.44, page 5).  He further claims his "[r]emedy would have been away from threats, ect. [sic] when you have the victim changing her story, your first arrest, a lawyer telling you this is what you have to do or you'll get life, coercion."  (*Id.*).  Without more, such allegations do not give rise to an ineffective assistance of counsel claim.

---

[8] A voluntary guilty plea waives all non-jurisdictional defects in the proceedings below except claims of ineffective assistance of counsel relating to the voluntariness of the plea.  *United States v. Glinsey*, 209 F.3d 386, 392 (5th Cir. 2000).  A guilty plea "and the ensuing conviction encompasses all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence."  *United States v. Broce*, 488 U.S. 563, 569 (1989).  A plea of guilty amounts to more than a mere confession; it is instead "an admission that [the defendant] committed the crime charged against him."  *Id.* at 570.  A guilty plea is "open to attack on the ground that counsel did not provide the defendant with 'reasonably competent advice.'"  *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980) (quoting *McMann v. Richardson*, 397 U.S. 759, 770-71 (1970)).  Counsel's advice to a defendant to accept a proposed plea agreement, in light of the facts and circumstances of the case, is normally considered to be a strategic choice that rests within counsel's professional judgment.  *See Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992).

### b. Access to Mail

Prisoners generally have "a First Amendment right to send and receive mail." *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989).  Plaintiff claims that defendants did not provide him with adaptive information technology systems in the Adaptive Resource Clinic by which he would communicate with persons outside the prison by mail; thereby, depriving him written contact with family, friends, or job prospects.  (Docket Entry No.44).

Kimberly Smith-Cotton attests that Adaptive Resource Clinic instructors "provide instruction and/or assistance to disabled offenders with letter writing to family members." (Docket Entry No.42, pages 2-3).  Smith-Cotton indicates that the ADS considered plaintiff's request for sound enhanced computer software so that he could write his private mail independently in the Adaptive Resource Clinic, but determined that the services and equipment provided adequately met his needs.  (*Id.*, pages 3-4).  Smith-Cotton notes that the software is technologically advanced and suitable for use by business professions and too advanced for the aims of the Adaptive Resource Clinic.  (*Id.*, page 4).  She further notes that plaintiff does not need the vocational training offered by the Adaptive Resource Clinic because he knows how to use computers and type on the keyboard, and he does not need a computer to write.  (*Id.*). Smith-Cotton observes that Adaptive Resource Clinic instructors can and do assist with letter writing, if requested.  She attests that "[r]eliance on others for this limited purpose does not significantly interfere with offender Wells's ability to live, work, or engage in rehabilitative programs within the prison."  (*Id.*).

Smith-Cotton further attests that the Adaptive Resource Clinic had at one time a mechanical reader similar to the one that plaintiff requested to read his private mail but it was seldom used, if at all because the reader was text-driven and most incoming mail was

handwritten.  (*Id.*).  Smith-Cotton notes that when she was notified that the reader was broken, she attempted to have it repaired; she later replaced the broken reader with a new one, which "permits blind offenders to read their private mail, if typed, independently in the Adaptive Resources Clinic."  (*Id.*).

Although he complains generally about the lack of adaptive equipment and the difficulty he experiences without the same, plaintiff does not specify one instance in which he was unable to correspond with family, friends, legal counsel, or a court.  Instead, the record shows that plaintiff corresponded with friends outside the prison without computer assistance. (Docket Entry No. 37-1, pages 8-9).  The record also shows that he was advised on July 11, 2008, that the software he requested, *i.e.*, JAWS, did not read personal mail and that his ADS caseworker was available to assist him with letter writing and would provide him with a letter guide.  (Docket Entry No. 37-8, page 15).  Plaintiff declined such services.  (*Id.*).

In short, the record shows that plaintiff's computer proficiency and ability to utilize the equipment and software in the Adaptive Resource Clinic exceeded the scope of the services provided by the Clinic to visually-impaired inmates; plaintiff proved proficient in communicating with others with the equipment available in the Clinic.  Based on this record, the Court finds no evidence giving rise to a fact issue that defendants violated Title II of the ADA or the First Amendment by denying plaintiff access to his mail.

### c. Abrogation of Sovereign Immunity

Because the summary judgment record does not give rise to a fact issue that defendants intentionally violated Title II of the ADA or plaintiff's First Amendment rights to access the court and to mail, the Court finds it unnecessary to determine whether Congress

validly abrogated the State's sovereign immunity under the facts in this case pursuant to the "congruence and proportionality test" in *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997).

C. Injunctive Relief

Prospective injunctive relief or declaratory relief against a state official is not barred under the exception to Eleventh Amendment immunity pursuant to *Ex parte Young* and its progeny.  209 U.S. 123 (1908); *Green v. Mansour*, 474 U.S. 64, 68 (1985); *Edelman v. Jordan*, 415 U.S. 651, 666-68 (1974).  "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  *Verizon Maryland, Inc. v. Public Serv. Com'n of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d/Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997)).  The *Ex parte Young* exception only applies when the named defendant state official has some connection with the enforcement of the act and "threaten and are about to commence proceedings to enforce the unconstitutional act.  *Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001).

Although plaintiff claims that numerous TDCJ and UTMB defendants may authorize an information technology system in the law library (Docket Entry No.44, page 11), defendants' uncontravened summary judgment evidence reflects that only defendant Frank Hoke, the Program Supervisor for the TDCJ's Access to Courts Department, has authority to grant the relief plaintiff seeks.  (Docket Entry No.42, pages 8; 15, 18).  Hoke attests that plaintiff is afforded access to the courts through the CCTV machine, volunteer offender assistance, scheduled law library sessions with other inmates, and assistance from the State Counsel for Offenders Division if requested and approved.  (*Id.*).  The record does not show that Hoke has

21

threatened, or that he is about to commence proceedings, to enforce any unconstitutional act or violation of the ADA that would deny plaintiff access to the courts.  Therefore, plaintiff's request for injunctive and declaratory relief will be denied.

<u>III. CONCLUSION</u>

Accordingly, the Court enters the following ORDERS:

1.      Plaintiff's Motion to Substitute Party Bruce Kalman in place of Laura M. Barnett (Docket Entry No.43) is GRANTED, to the extent that Kalman succeeds Barnett as a litigant in her official capacity.

2.      Plaintiff's Motion to Supplement the Summary Judgment record with a 2009 unexhausted grievance (Docket Entry No.46) is DENIED.

3.      Defendants' Motion for Summary Judgment (Docket Entry No.37) is GRANTED.  All claims against all defendants are DENIED and this civil action is DISMISSED WITH PREJUDICE.

4.      All other pending motions, if any, are DENIED.

The Clerk shall send a copy of this Order to the parties.

SIGNED at Houston, Texas, this 30th day of August, 2010.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

22